UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/2/13

*In re: Hi-Crush Partners L.P. Securities Litigation*                    No. 12 Civ. 8557 (CM)

———————————————————————x

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

McMahon, J.:

A putative class of shareholders of Hi-Crush Partners L.P. (together with its subsidiaries, "Hi-Crush") brings this action against Hi-Crush, its general partner, Hi-Crush GP, the underwriters of Hi-Crush's public offering, and several Hi-Crush GP officers and board members (collectively, "Defendants"), for claims arising under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l, and 77o; Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5.

The Defendants moved to dismiss all claims pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Because Plaintiff has failed to adequately plead its claims under Sections 11, 12(a)(2), and 15 of the Securities Act, the motions to dismiss those claims are granted. The motions to dismiss the claims under Sections 10(b) and 20(a) of the Exchange Act are denied.

1

## BACKGROUND[1]

In the Amended Consolidated Class Action Complaint ("Complaint"), court-appointed Lead Plaintiffs HITE Hedge LP and HITE MLP LP (collectively, "Plaintiff") claim that Hi-Crush omitted crucial information about a serious contract dispute with a large customer—Baker Hughes Oilfields Operations Inc., a subsidiary of Baker Hughes Inc. (collectively, "Baker Hughes")—from its July 2012 initial public offering ("IPO") documents and from a September 2012 investor presentation. Plaintiff contends that Hi-Crush's public statements regarding its contractual relationship with Baker Hughes were rendered materially misleading by these omissions.

### I. The Hi-Crush Organization

Hi-Crush produces and sells specialized sand—"frac sand"—used to enhance the recovery rates of hydrocarbons from oil and gas wells. *See* Compl. at ¶¶ 2, 53. Hi-Crush is a Delaware limited partnership formed on May 8, 2012 to acquire certain assets and facilities of Hi-Crush Proppants LLC ("Hi-Crush Proppants"). *See id.* at ¶ 2. Defendant Hi-Crush GP, a wholly-owned subsidiary of Hi-Crush Proppants, is Hi-Crush's general partner. *See id.* at ¶ 18. Hi-Crush GP's officers and board of directors manage Hi-Crush's operations. *See id.*; Thau Decl. Ex. 1 at 130.

---

[1] The facts are taken from the Complaint, documents incorporated therein, publicly-filed SEC documents, and other publicly-available documents, including: (1) the Hi-Crush Registration Statement with exhibits, (2) the September 25, 2012 Hi-Crush investor presentation, and (3) the July 2, 2012 letter from the SEC.

## II. The Contract Dispute with Baker Hughes

On October 28, 2011, Hi-Crush Operating LLC (which would later become a subsidiary

of Hi-Crush) and Baker Hughes executed a five-year supply agreement ("agreement") pursuant

to which Hi-Crush Operating LLC would provide certain minimum amounts of sand to Baker

Hughes each year beginning in May 2012. *See* Compl. at ¶ 8. The agreement included a

confidentiality provision that stated: "Except as otherwise provided under this Agreement or as

may be required by law or regulation, neither Party, without the prior written consent of the other

Party, will disclose to any other Person [ ] the fact that this Agreement exists . . ." *Id.* at ¶ 65;

Thau Decl. Ex. 1 at Ex. 10.8 § 6.5. It also included a rather onerous termination provision;

Baker Hughes could only terminate the contract if Hi-Crush committed at least four material

breaches in a 12-month period and failed to cure them.[2] *See id.* at Ex. 10.8 § 8.2.

In February 2012, Baker Hughes sought to amend its agreement with Hi-Crush. *See*

Compl. at ¶ 64. The parties executed an amendment to the agreement on May 10, 2012. *See id.*

The amended agreement reduced Baker Hughes's minimum purchase requirement in the first

contract year, but extended the duration of the contract to six years and augmented the aggregate

purchase requirement over the life of the agreement. *See id.*; Thau Decl. Ex. 1 at Ex. 10.8 § 2.1;

*id.* at Ex. 10.9 § 2.1. No change was made to the confidentiality provision or the termination

provision. *See id.*

In July 2012, Hi-Crush prepared to launch its IPO. On July 6, 2012, Hi-Crush filed its S-

1 Form Registration Statement ("Registration Statement") with the SEC. *See* Compl. at ¶ 65. Hi-

Crush attached redacted versions of the original agreement with Baker Hughes and the May 2012

amendment as exhibits to its Registration Statement. *See* Thau Decl. Ex. 1 at Exs. 10.8, 10.9; *id.*

---

[2] There were other bases for contract termination for breaches related to quality or quantity of sand, but those bases
are not relevant here. *See* Thau Decl. Ex. 1 at Ex. 10.8 § 8.2.

at Ex. 3 ¶ 12. This was done because Hi-Crush was notified by the SEC that disclosure of the

contracts themselves was required by SEC Regulation S-K. *See id.* Hi-Crush did not provide

Baker Hughes with prior written notice of its intent to disclose the agreement. *See* Compl. at

¶¶ 65-66.

Hi-Crush filed its final prospectus for the IPO on August 16, 2012. *See id.* at ¶ 48. The

Registration Statement went into effect on the same day. *See id.*

Hi-Crush highlighted its business relationship with Baker Hughes throughout the

Registration Statement and the prospectus[3] (collectively, "offering documents"). *See id.* at

¶¶ 51-57, 105-13. The offering documents stated that Baker Hughes was one of Hi-Crush's four

key customers and that the Baker Hughes agreement represented 18.2% of Hi-Crush's projected

revenues for 2012. *See id.* at ¶¶ 4-5, 51-53, 55, 105-13, 131. They touted Baker Hughes's

positive credit ratings and the fact that Baker Hughes and the other three customers "accounted

for greater than 50% of the North American pressure pumping market." *See id.* at ¶ 53.

The offering documents also emphasized the importance of Hi-Crush's contracts with its

four main customers:

> A key component of our business model is our contracting
> strategy, which seeks to secure a high percentage of our cash flows
> under *long-term, fixed price contracts* with take-or-pay provisions,
> while also staggering the tenors of our contracts so that they expire
> at different times. We believe this contracting strategy significantly
> mitigates our exposure to the potential price volatility of the spot
> market for frac sand in the short-term, allows us to take advantage
> of any increase in frac sand prices over the medium-term and
> provides us with *long-term cash flow stability*.

*Id.* at ¶ 54 (emphasis added). Hi-Crush acknowledged that "the loss of, or significant reduction

in purchases by, any of [the four main customers] could adversely affect [its] business, financial

condition and results of operations." *Id.* at ¶ 56.

---

[3] The prospectus is part of the Registration Statement. *See* Compl. at ¶ 48.

On August 21, 2012, Hi-Crush completed its IPO. *See id.* at ¶ 49. Defendants Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Morgan Stanley & Co. LLC, Raymond James & Associates, Inc., Robert W. Baird & Co. Incorporated, RBC Capital Markets, LLC, and UBS Securities LLC (collectively, "Underwriter Defendants") acted as underwriters for the IPO and assisted Hi-Crush in planning the IPO. *See id.* at ¶¶ 30-37. The IPO was successful; more than 12.9 million shares of Hi-Crush common shares were sold to the public at $17 per unit, raising approximately $220 million (gross) for Hi-Crush GP. *See id.* at ¶¶ 3, 37, 49.

Although the agreement's confidentiality clause contained an express carve-out for information that had to be disclosed as required by law or regulation, Baker Hughes sent Hi-Crush a letter purporting to terminate the agreement ("the repudiation letter") on September 19, 2012. *See id.* at ¶¶ 63-65, 127. It cited Hi-Crush's alleged breach of the confidentiality provision as the reason. *See id.* The termination letter alleged that Hi-Crush had improperly disclosed confidential information in its Registration Statement on July 6, 2012 by attaching the agreement to the Registration Statement as an exhibit without providing written notice of the intended disclosure to Baker Hughes. *See id.* at ¶¶ 64, 65, 127. It also alleged that Hi-Crush allowed an underwriter to discuss the terms of the agreement in an analyst report issued on September 16, 2012, after the IPO. *See id.* at ¶ 65.

On approximately September 25, 2012, Hi-Crush posted an investor presentation on its website. *See id.* at ¶¶ 6, 116, 128. Like the Registration Statement, this presentation hyped Hi-Crush's long-term contractual relationships with Baker Hughes and its other key customers. *See id.* at ¶¶ 116-20. It did not disclose the Baker Hughes repudiation letter or hint at the existence of any uncertainty regarding the future of the contractual relationship. *See id.* at ¶¶ 118, 120.

5

Defendants Robert E. Rasmus and Laura C. Fulton, Co-Chief Executive Officer ("Co-CEO") and Chief Financial Officer ("CFO") of Hi-Crush GP, used this investor presentation in a live presentation given on behalf of Hi-Crush at the Energy Prospectus Group luncheon in Houston, Texas on September 25, 2012. *See id.* at ¶ 116.

In November 2012, the contract dispute between Hi-Crush and Baker Hughes was finally revealed to investors. On November 12, 2012, Hi-Crush filed an Original Petition in Harris County District Court, *Hi-Crush Operating LLC v. Baker Hughes Oilfield Operations*, No. 2012-67261 ("the Harris County case"), alleging breach of contract and seeking liquidated damages. *See id.* at ¶¶ 8, 63-64, 127. The next day, Hi-Crush issued a press release about the dispute:

> Hi-Crush also announced today the termination of the supply agreement with Baker Hughes Oilfield Operations, Inc. On September 19, 2012, Baker Hughes provided notice that it was terminating the contract. Hi-Crush believes that Baker Hughes' termination was wrongful and a direct effort to circumvent its binding purchase obligations under the supply agreement. Hi-Crush engaged in discussions with Baker Hughes after receiving the notice, but the parties were unable to reach a mutually satisfactory resolution of the matter. On November 12, 2012, Hi-Crush formally terminated the supply agreement and filed suit in the State District Court of Harris County, Texas against Baker Hughes seeking damages for Baker Hughes' prior wrongful termination of the supply agreement.

*See id.* at ¶ 127.

Following these revelations, the price of Hi-Crush common shares declined precipitously. *See id.* at ¶¶ 10, 129. On the first day of trading after the news of the contract dispute went public, Hi-Crush's shares lost approximately 26% of their value on unusually high trading volume, falling from $20.35 per unit on November 12, 2012 to close at $15.00 per unit on November 13, 2012. *See id.* at ¶ 129. The November 13, 2012 intra-day low was $13.21 per unit. *See id.*

On December 17, 2012, Baker Hughes filed an Original Answer and Counterclaim in the Harris County case. *See id.* at ¶¶ 8, 65-66, 127. It echoed the repudiation letter, claiming that

6

Hi-Crush had committed the first material breach of the parties' agreement by violating the confidentiality provision when it disclosed the existence of the agreement pursuant to SEC regulation on July 6, 2012. *See id.* Baker Hughes stated that the "disclosure [was] not permitted within the limited circumstances provided by the Supply Agreement. Moreover, [Hi-Crush] wholly failed to provide [Baker Hughes] with any prior written notification of the intended disclosure." *See id.* ¶ 65.

### III. The Plaintiff's Claims

In this case, Plaintiff seeks to represent a class of "all persons or entities who purchased the common units of Hi-Crush Partners LP, pursuant and/or traceable to the Registration Statement and Prospectus issued in connection with its August 16, 2012 initial public units offering ('IPO'), including units purchased on the open market during the period from August 16, 2012 through November 12, 2012." *See id.* at ¶ 1. Plaintiff brings claims under the Securities Act and the Exchange Act based on Hi-Crush's alleged material misrepresentations and omissions relating to the contract dispute with Baker Hughes.

Count I arises under Section 11 of the Securities Act, which prohibits materially misleading statements or omissions in registration statements filed with the SEC. *See id.* at ¶¶ 69-79; 15 U.S.C. § 77k(a). The Defendants on Count I include Hi-Crush, Hi-Crush GP, the Underwriter Defendants, and several officers and directors of Hi-Crush GP who signed the Hi-Crush Registration Statement. *See* Compl. at ¶¶ 20-28, 70, 72.

Count II arises under Section 12(a)(2) of the Securities Act, which prohibits materially misleading statements or omissions in prospectuses or oral communications used in selling securities. *See id.* at ¶¶ 80-94; 15 U.S.C. § 77l(a)(2). The Defendants on Count II include Hi-Crush and the Underwriter Defendants. *See* Compl. at ¶ 94.

Count III arises under Section 15 of the Securities Act, which is the 1933 Act's provision for "control-person liability." *See id.* at ¶¶ 95-102; 15 U.S.C. § 77o. It identifies Defendants Hi-

Crush GP, Rasmus, Fulton, James M. Whipkey, Jefferies V. Alston, Robert L. Cabes, Jr., John R. Huff, Trevor Turbidy, and Steven A. Webster as control persons of Hi-Crush. *See* Compl. at ¶¶ 95-102.

The Exchange Act claims in Counts IV and V likewise allege that Registration Statement and the prospectus were materially misleading. *See id.* at ¶¶ 104-15, 127, 143-57. They also assert that, after Baker Hughes sent the repudiation letter on September 19, 2012, Hi-Crush made material misrepresentations and omissions by continuing to hype its relationship with Baker Hughes in the investor presentation, while failing to disclose the repudiation at any time prior to initiating the Harris County case on November 12, 2012. *See id.* at ¶¶ 116-20, 128.

Count IV arises under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and seeks to impose primary liability for alleged misrepresentations or omissions on Hi-Crush, Rasmus, Whipkey, Fulton, and Alston (collectively, "10(b) Defendants"). *See id.* at ¶¶ 143-51.

Count V arises under Section 20(a) of the Exchange Act; it alleges that Hi-Crush GP, Rasmus, Whipkey, Fulton, and Alston (collectively, "20(a) Defendants") are liable for the primary securities fraud violations committed by Hi-Crush as "control persons." *See id.* at ¶¶ 152-57.

The Defendants have moved to dismiss all claims pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6), and to the PSLRA.

## DISCUSSION

### I. Standard on a Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

However, to survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *see also Iqbal*, 556 U.S. at 680.

While factual allegations should be construed in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678.

This liberal pleading standard is modified by Federal Rule of Civil Procedure 9(b) in cases where a claim "sounds in fraud," including actions for securities fraud. *See* FED. R. CIV. P 9(b); *Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004). In addition, the PSLRA requires application of a heightened pleading standard to claims brought under the Exchange Act. *See* 15 U.S.C. § 78u-4. These special pleading rules are discussed below. *See infra* at § III.

In deciding a motion to dismiss, a court may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. *See Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir.

2000) (citing *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991)); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996).

## II. The 1933 Securities Act Claims Are Dismissed.

Sections 11, 12(a)(2), and 15 of the Securities Act "impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). Section 11 applies to registration statements, and Section 12(a)(2) applies to prospectuses and oral communications. *See id.*; 15 U.S.C. §§ 77k(a), 77l(a)(2). Section 15 establishes "control-person liability"—liability for individuals or entities that "control[ ] any person liable" under Section 11 or 12. *Id.* § 77o. A plaintiff must demonstrate "primary" liability under Section 11 or 12 in order to establish control-person liability under Section 15. *See In re Morgan Stanley*, 592 F.3d at 358, 366.

Under these statutes, a plaintiff must establish one of three bases for liability: "(1) a material misrepresentation; (2) a material omission in contravention of an *affirmative legal disclosure obligation*; or (3) a material omission of information that is necessary to prevent existing disclosures from being *misleading* . . ." *Litwin v. Blackstone*, 634 F.3d 706, 715-716 (2d Cir. 2011) (emphasis added); *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011).

"Materiality is an 'inherently fact-specific finding' . . . that is satisfied when a plaintiff alleges 'a statement or omission that a reasonable investor would have considered significant in making investment decisions.'" *Litwin*, 634 F.3d at 716-17 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988)). The materiality requirement does not pose a high burden at the motion to

10

dismiss stage; "a complaint may not properly be dismissed . . . on the ground that the alleged

misstatements or omissions are not material unless they are so obviously unimportant to a

reasonable investor that reasonable minds could not differ on the question of their importance."

*Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 181 (S.D.N.Y. 2010) (quoting *Ganino*

*v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)).

When an omission (as opposed to a misrepresentation) is alleged, however, it is

actionable under the securities laws[4] only where a corporation has a duty to disclose the

information. *See In re Morgan Stanley*, 592 F.3d at 360-61; *In re Time Warner Inc. Sec. Litig.*, 9

F.3d 259, 267 (2d Cir. 1993). The securities laws do not require a corporation "to disclose a fact

merely because a reasonable investor would very much like to know that fact." *Id.* There are

two independent bases upon which one might have a duty to disclose: (1) there is an "affirmative

legal disclosure obligation," or (2) "disclosure is 'necessary to prevent existing disclosures from

being misleading.'" *In re Lehman Bros. Sec. and Erisa Litig.*, 799 F. Supp. 2d 258, 275

(S.D.N.Y. 2011); *see also In re Morgan Stanley*, 592 F.3d at 360-66.

Under the latter prong, a corporation has a duty to disclose in order to avoid misleading

investors if there is "a substantial likelihood that the disclosure of the omitted fact would have

been viewed by the reasonable investor as having *significantly altered* the 'total mix' of

information available." *Time Warner*, 9 F.3d at 267-68 (quoting *TSC Industries, Inc. v.*

*Northway, Inc.*, 426 U.S. 438, 449 (1976)) (emphasis added).

---

[4] For both Securities Act and Exchange Act claims based on material omissions, courts use the same test in
determining whether the alleged omission is actionable. *See In re Morgan Stanley*, 592 F.3d at 360; *ECA & Local
134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009); *I. Meyer Pincus
& Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761-62 (2d Cir. 1991); *Stratte-McClure v. Morgan Stanley*, No. 09
Civ. 2017 (DAB), 2013 WL 297954, at \*5 n.3 (S.D.N.Y. Jan. 18, 2013); *Coronel v. Quanta Capital Holdings Ltd.*,
No. 07 Civ. 1405 (RPP), 2009 WL 174656, at \*24-26 (S.D.N.Y. Jan. 26, 2009).

In determining whether offering documents omit information that a corporation had a duty to disclose, courts "review the documents holistically . . ." *In re Morgan Stanley*, 592 F.3d at 366. "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of 'defendants' representations, taken together and in context.'" *Id.* (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)).

"The truth of a statement made in the registration statement is adjudged by the facts as they existed when the registration statement became *effective*." *Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08 Civ. 7062, 2010 WL 4642554, at *11 (S.D.N.Y. Nov. 17, 2010) (emphasis added); *see also* 15 U.S.C. § 77k(a).

### A.    Duty to Disclose to Avoid Misleading Investors

In the Complaint, Plaintiff alleges that Hi-Crush touted its contractual relationship with Baker Hughes in the offering documents while failing to disclose several key pieces of information. Specifically, the Registration Statement listed Baker Hughes and Halliburton as Hi-Crush's "largest customers based on current contracts" and highlighted their positive credit ratings from Moody's and Standard & Poor's. *See* Compl. at ¶ 53. Hi-Crush allegedly "emphasiz[ed] the strength" of its relationship with Baker Hughes, stating that Baker Hughes was "under [a] long-term, take-or-pay contract[] that require[d] [it] to pay a specified price for a specified volume of frac sand each month." *Id.* at ¶ 52. Hi-Crush explained that such long-term contracts "significantly reduce [its] exposure to short-term fluctuations" in sand prices and "provide [it] with long-term cash flow stability." *Id.* at ¶¶ 53-54. Hi-Crush's Registration Statement did warn that "the loss of, or significant reduction in purchases by, any of [its four main customers] could adversely affect [its] business, financial condition and results of operations." *Id.* at ¶ 56.

12

The alleged material omissions in the offering documents fall into three categories: (1) failure to disclose Hi-Crush's "strained" relationship with Baker Hughes; (2) failure to disclose that Hi-Crush had already committed a material breach of the amended agreement in July 2012 by disclosing the existence of the agreement;[5] and (3) failure to disclose that Baker Hughes *believed* that Hi-Crush had committed a material breach, whether disclosure of the agreement was a breach or not. *See* Compl. at 2-3, 14-22.

In its brief opposing the motions to dismiss, Plaintiff focuses on the second category of allegations—that Hi-Crush failed to disclose that it had actually breached the agreement with Baker Hughes. *See* Pl. Opp. at 19-25. However, none of Plaintiff's allegations establishes a material misstatement or omission in the offering documents.

First, Plaintiff grounds its allegations of failure to disclose a strained relationship between Hi-Crush and Baker Hughes on the fact that Baker Hughes sought to renegotiate the parties' agreement in February 2012. *See* Compl. at ¶ 67. Plaintiff asserts that Baker Hughes was "dissatisfied" with its original contract and that it "demand[ed] significant concessions" in the renegotiation. *See id.* at ¶¶ 57, 66. The alleged "concession" was a reduction in the "minimum amount of sand that Baker Hughes was required to purchase [from Hi-Crush] in the first contract year." *See id.* at ¶ 67.

However, as Hi-Crush points out, the renegotiation resulted in an amended agreement with a longer duration and a greater aggregate purchase requirement. *See* Hi-Crush Memo at 4; Thau Decl. Ex. 1 at Ex. 10.8 § 2.1; *id.* at Ex. 10.9 § 2.1. So the renegotiation led to a longer-term

---

[5] The Defendants argue that the Complaint does not allege a failure to disclose Hi-Crush's actual breach of contract in July 2012, but instead merely alleges a failure to disclose Baker Hughes's *belief* that Hi-Crush breached. *See* Hi-Crush Reply at 1-4; Underwriters Reply at 1-2. According to the Defendants, Plaintiff has made an improper attempt to amend the Complaint through its opposition brief. *See id.*; Hi-Crush Reply at 1-4. This argument fails. As Hi-Crush acknowledges in a footnote of its brief, *see id.* at 4 n.2, the Complaint states: "[T]his breach [of the agreement with Baker Hughes] was not disclosed in the Registration Statement." *See* Compl. at ¶ 66. Though the Complaint places more emphasis on Baker Hughes's belief in the breach than it does the breach itself, it sufficiently alleges that Hi-Crush failed to disclose both those facts.

13

relationship between Hi-Crush and Baker Hughes that, based on the evidence, could not be fairly characterized as "strained" when the offering documents went into effect on August 16, 2012.

Moreover, Registration Statement disclosed the changes made to the contract in May 2012; at the SEC's insistence, Hi-Crush attached both the original agreement and the amended agreement as exhibits to the Registration Statement. *See id.*; *id.* at Ex. 10.8 § 2.1; Hi-Crush Memo at 11. Thus, Hi-Crush disclosed all the material information relating to the renegotiation. It was not required to describe in detail any "preliminary discussions" it had with Baker Hughes. *See In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 529 (S.D.N.Y. 2009); *see also McKenna v. Smart Techs. Inc.*, No. 11 Civ. 7673 (KBF), 2012 WL 1131935, at *15 (S.D.N.Y. Apr. 3, 2012). Such a requirement would impose "substantial burdens on businesses." *Id.*

Second, Plaintiff alleges that Hi-Crush failed to disclose that it breached its agreement with Baker Hughes by violating the confidentiality provision. *See* Compl. at ¶¶ 65-66. This provision states, in part, that "neither Party, without the prior written consent of the other Party, will disclose to any other Person [ ] the fact that this Agreement exists . . ." *See* Pl. Opp. at 2 (quoting Thau Decl. Ex. 1 at Ex. 10.8 § 6.5). Plaintiff asserts that Hi-Crush breached this provision on July 6, 2012 when it filed its Registration Statement with the SEC and attached the agreement as an exhibit "without providing prior written notification" to Baker Hughes. *See id.* at 1; *see also* Compl. at ¶¶ 65-66. Plaintiff argues that, because Hi-Crush disclosed the fact that the agreement existed to another "Person"—the SEC—and did not provide Baker Hughes with prior notification of its intent to do so, Hi-Crush materially breached the agreement. *See id.*; Pl. Opp. at 2, 21. Because Hi-Crush touted its stable, long-term relationship with Baker Hughes in the Registration Statement, Plaintiff contends that the contract breach was a material fact that Hi-

14

Crush was required to disclose "to prevent existing disclosures [about Baker Hughes] from being misleading." *In re Lehman Bros.*, 799 F. Supp. 2d at 275; Pl. Opp. at 21-22.

In other words, Plaintiff argues that Hi-Crush had a duty to disclose—in its Registration Statement or otherwise—the fact that the filing of the Registration Statement itself constituted a breach of the Baker Hughes agreement and put this important customer relationship at risk. The failure to do so, Plaintiff argues, violated the Securities Act.

Under certain circumstances, a company could have a duty to disclose a breach of contract that puts an important, publicly-touted business relationship at great risk. *See infra* at § III.A.1; *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1280-83 (2d Cir. 1969). Such a breach could be seen as "significantly alter[ing] the 'total mix' of information available" such that failing to disclose the breach would mislead investors. *See Time Warner*, 9 F.3d at 267-68.

But no such breach occurred in this case—at least, not prior to the date the Registration Statement became effective. There are three reasons why this is so.

First, Plaintiff disregards a key clause in the confidentiality provision of the Baker Hughes agreement. The relevant portion of the provision states: "*Except* as otherwise provided under this Agreement or *as may be required by law or regulation*, neither Party, without the prior written consent of the other Party, will disclose to any other Person [ ] the fact that this Agreement exists . . ." Thau Decl. Ex. 1 at Ex. 10.8 § 6.5 (emphasis added).

In a letter to Hi-Crush dated July 2, 2012, the SEC provided "comments" regarding Hi-Crush's draft Registration Statement. *See id.* at Ex. 3. It stated:

> We note your response to prior comment 38 and reissue. We note that the statement on page 27 that "[s]ubstantially all of our sales are generated under contracts with four customers, and the loss of, or significant reductions in purchases by, any of them could adversely affect our business, financial condition and results of operations" appears inconsistent with your response. *Please*

15

> *include the four long-term sales contracts in your exhibit index.*
> *See Item 601(b)(10)(ii)(B) of Regulation S-K.*

*See id.* at Ex. 3 ¶ 12 (emphasis added). Item 601(b)(10)(ii)(B) of Regulation S-K requires

securities registrants to attach as exhibits to their Registration Statements any material contracts

"upon which the registrant's business is *substantially dependent*, as in the case of continuing

contracts to sell the major part of registrant's products or services . . ." 17 C.F.R.

§ 229.601(b)(10)(ii)(B) (emphasis added).

The SEC correctly noted—and Hi-Crush outright acknowledged in its offering

documents—that Hi-Crush's contracts with Baker Hughes and its three other key customers were

material contracts "to sell the major part of [Hi-Crush's] products" upon which Hi-Crush's

business was "substantially dependent." *See id.* The Baker Hughes agreement represented

18.2% of Hi-Crush's revenues. Thus, Item 601(b)(10)(ii)(B) required inclusion of the Baker

Hughes agreement as an exhibit to the Registration Statement, and Hi-Crush was "required by

law or regulation" to disclose the agreement. Therefore, Hi-Crush did not need Baker Hughes's

"prior written consent" under the circumstances, and this disclosure did not violate the

confidentiality provision of the agreement.

Plaintiff might argue (though it has not done so, at least not explicitly) that Hi-Crush was

required to provide prior written notice of the disclosure of the agreement to Baker Hughes

pursuant to another clause of the confidentiality provision, which stated:

> If a receiving Party receives a request to disclose all or any part of
> the disclosing Party's Confidential Information under the terms of
> a *valid and effective subpoena, decree or order issued* by a court of
> competent jurisdiction or *by a governmental body*, the receiving
> Party hereby agrees to . . . immediately notify the disclosing Party
> in writing of the existence, terms and circumstances surrounding
> the request, so that the disclosing Party may seek an appropriate
> protective order or waive the receiving Party's compliance with the
> provisions of this Agreement (and, if the disclosing Party seeks an

16

order, to provide the cooperation as said owner shall reasonably
request) . . .

Thau Decl. Ex. 1 at Ex. 10.8 § 6.5 (emphasis added). But there was no "subpoena, decree or
order" in this case. The July 2, 2012 SEC letter was not a legally binding "order." It included
permissive statements like "we may ask you to provide us with information so we may better
understand your disclosure" and "[i]f you do not believe our comments apply to your facts and
circumstances or do not believe an amendment is appropriate, please tell us why in your
response." *See id.* at Ex. 3. The letter constituted an SEC advisory about the types of disclosures
required by Item 601 of Regulation S-K; disclosure was not required by the letter, or by the
agency, but by regulation. The contract specifically carved out regulatorily-mandated
disclosures from any prior notice requirement—even though the regulations were adopted by a
governmental body.

Further, there was no ongoing formal proceeding in which Baker Hughes would have had
an opportunity to object to the "valid[ity]" of a "subpoena, decree or order" or to "seek an
appropriate protective order," which would have been the sole purpose of "immediately
notify[ing]" Baker Hughes of the disclosure. *See id.* Ex. 1 at Ex. 10.8 § 6.5. Thus, the
confidentiality provision required no prior written notice of this disclosure.

Hi-Crush attempted to balance Baker Hughes's confidentiality interests with the plain
requirements of Item 601 of Regulation S-K by filing only *redacted* versions of the original
agreement and the amendment. The confidentiality clause did not require Hi-Crush to violate
Item 601 by refraining from disclosing the agreement entirely; it sensibly had an explicit
exception for such a disclosure. Therefore, filing the Registration Statement with the agreement
attached without notifying Baker Hughes in advance did not constitute a breach of the
agreement, and there was no material fact for Hi-Crush to disclose to investors.

17

Second, even if Hi-Crush did breach the agreement by not sending notice, omitting that fact from the Registration Statement would not be material. The law requires disclosure only when a breach of contract puts a business relationship at risk. *See infra* p. 15. Baker Hughes had no right to terminate the agreement absent at least *four* material uncured breaches by Hi-Crush. *See* Thau Decl. Ex. 1 at Ex. 10.8 § 8.2. One breach did not provide a valid basis for termination, and there were at most two potential "breaches" prior to the IPO—one in disclosing the agreement to the SEC, and one in disclosing it to investors by attaching it to the Registration Statement. So the purported breach did not threaten continuation of the parties' business dealings per the terms of their contract.

Third, and most important, Baker Hughes did not allege that Hi-Crush had breached the agreement until it sent the repudiation letter on September 19, 2012. There was no reason to suspect at the time that the Registration Statement became effective—August 16, 2012—that Baker Hughes would claim that Hi-Crush breached the agreement by complying with Item 601 and disclosing the agreement. Nor was there any reason to think that Baker Hughes would attempt to repudiate the agreement, as it did the following month. A corporation's duty to disclose is "adjudged by the facts as they existed when the registration statement became effective." *Charter Twp. of Clinton*, 2010 WL 4642554, at *11.

Plaintiff alleges that Hi-Crush failed to disclose Baker Hughes's belief that Hi-Crush breached the parties' agreement. *See* Compl. at ¶¶ 57, 65-66. But Plaintiff does not allege any fact tending to show that Baker Hughes communicated this belief prior to sending the repudiation letter on September 19, 2012—over a month after the Registration Statement became effective on August 16, 2012. *See id.* at ¶¶ 3, 7-9, 64. Hi-Crush had no duty to disclose this information in the offering documents. *See In re Lehman Bros.*, 799 F. Supp. 2d at 275.

18

**B.     Affirmative Legal Disclosure Obligation**

Hi-Crush's offering documents did not violate any affirmative legal disclosure obligation.

Plaintiff contends that Hi-Crush had a duty to disclose the alleged problems with Baker

Hughes discussed above, *see supra* at § II.A, pursuant to Item 303 of Regulation S-K, 17 C.F.R.

§ 229.303.[6]  *See* Compl. at ¶ 58; Pl. Opp. at 23-25.  This regulation requires that SEC filings

"[d]escribe any known trends or uncertainties that have had or that the registrant reasonably

expects will have a material favorable or unfavorable impact on net sales or revenues or income

from continuing operations."  *See* 17 C.F.R. § 229.303(a)(3)(ii).  It imposes an affirmative

disclosure duty "where a trend, demand, commitment, event or uncertainty is both [1] *presently*

*known* to management and [2] reasonably likely to have material effects on the registrant's

financial condition or results of operations."  *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,

681 F.3d 114, 120 (2d Cir. 2012) (emphasis added).  Failure to disclose such information can

form a basis for liability under Sections 11 and 12 of the Securities Act.  *See id.* at 120-21.

Plaintiff alleges that the "adverse events and uncertainties associated with Hi-Crush's

business relationship with Baker Hughes was [sic] reasonably likely to have a material impact on

Hi-Crush's continuing operations and therefore were required to be disclosed in the Registration

Statement, but were not."  Compl. at ¶ 58.  That would be true if Hi-Crush knew, while in

registration, that Baker Hughes would react to the IPO disclosures by asserting that Hi-Crush

breached the agreement.  But at the time the Registration Statement became effective on August

16, 2012, there was no "trend or uncertainty" regarding the relationship with Baker Hughes that

---

[6] In its brief opposing the motions to dismiss, Plaintiff also contends that these omissions violated Item 503(c) of Regulation S-K.  *See* Pl. Opp. at 24.  However, Plaintiff made no mention of this allegation in the Complaint. Accordingly, this Court will disregard the argument as an improper attempt to amend the Complaint through a brief. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 305 (S.D.N.Y. 2008).

was "presently known" to Hi-Crush. *See Panther Partners*, 681 F.3d at 120. In fact, as described above, *see supra* at § II.A, there were no problems with Baker Hughes that would have been apparent to Hi-Crush. The contract renegotiation in May 2012 had resulted in a longer-term agreement; Baker Hughes was at that time meeting its purchase obligations; and Hi-Crush had no reason to imagine that Baker would take a contractually insupportable position about the terminability of the contract. *See supra* at § II.A; Compl. at ¶ 64; Hi-Crush Memo at 13. Item 303 imposed no duty on Hi-Crush to anticipate that Baker Hughes would make such arguments in the future. *See Panther Partners*, 681 F.3d at 120.

Thus, Hi-Crush omitted no information from its offering documents that it had a duty to disclose. Accordingly, Plaintiff has not adequately alleged that Hi-Crush made a material misstatement or omission for which it can be held liable under Section 11 or 12(a)(2), and Counts I and II are dismissed with prejudice.

Because Plaintiff has failed to plead an underlying primary violation of Section 11 or 12(a)(2), its claims under Section 15 likewise fail. Count III is dismissed with prejudice.

### III. The Motion to Dismiss the 1934 Securities Exchange Act Claims Is Denied.

Plaintiff also brings claims for securities fraud under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78a, *et seq. See* Compl. at 45-49. To state a claim under Section 10(b), and the accompanying regulation Rule 10b-5, Plaintiff must allege that Defendants (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury. *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Section 20(a) of the Exchange Act establishes "control-person liability"—joint and several liability for every person who, directly or indirectly, controls any person liable under any provision of the Act. *See* 15 U.S.C. § 78t(a).  Plaintiff must demonstrate primary liability under Section 10(b) and Rule 10b-5 before it can prove control-person liability. *See Hutchins v. NBTY, Inc.*, No. 10 Civ. 2159 (LDW)(WDW), 2012 WL 1078823, at *5 (E.D.N.Y. Mar. 30, 2012).

Along with Rule 12(b)(6) requirements, a complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). The PSLRA also requires a plaintiff to "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement is misleading . . ." and to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(1)(B) and (b)(2)(A).

Here, the 10(b) Defendants contend that Plaintiff fails to adequately plead two Section 10(b) elements: (1) material misstatements or omissions of material fact, and (2) scienter.  They also argue that the Complaint does not meet the heightened pleading standards for securities fraud.  At this stage, these arguments fail.

### A.    Material Misstatements or Omissions

#### 1.    Duty to Disclose to Avoid Misleading Investors

Plaintiff repeats its factual allegations in support of its Securities Act claims and argues that Hi-Crush's failure to disclose important information in its Registration Statement violated the Exchange Act as well. *See* Compl. at ¶¶ 143-57.  Plaintiff again asserts that the Registration Statement hyped Hi-Crush's relationship with Baker Hughes while making actionable omissions relating to the "strained" relationship with Baker Hughes, Hi-Crush's alleged breach of the

agreement, and Baker Hughes's belief that Hi-Crush breached the agreement. *See id.* at ¶¶ 104-15, 127.

As explained above, *see supra* at § II.A, Hi-Crush had no duty to disclose these "facts" (which were not facts at all in August 2012) in the Registration Statement. Thus, Plaintiff's theory that Hi-Crush made actionable omissions in its Registration Statement fails.

Plaintiff next argues that Hi-Crush had a duty to disclose that Baker Hughes repudiated its agreement with Hi-Crush on September 19, 2012. *See* Compl. at ¶¶ 116-20, 128; Pl. Opp. at 6-12. Because Hi-Crush continued to publicly tout its relationship with Baker Hughes and did not disclose the repudiation until November 13, 2012, Plaintiff contends, Hi-Crush violated this duty. *See id.*

A corporation has a duty to disclose a fact in order to avoid misleading investors if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly altered* the 'total mix' of information available." *Time Warner*, 9 F.3d at 267-68 (quoting *TSC Industries*, 426 U.S. at 449) (emphasis added). A corporation must make a disclosure "whenever secret information renders prior public statements *materially misleading*, not merely when that information completely negates the public statements." *Id.* at 268 (emphasis added). Hence, misleading "half-truth[s]" can be actionable. *See In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446 (S.D.N.Y. 2006).

In Staff Accounting Bulletin ("SAB") No. 99, the SEC enumerated "qualitative" factors that influence materiality, including whether a misstatement or omission "concerns a segment or other portion of the registrant's business that has been *identified as playing a significant role* in the registrant's operations or profitability." SEC SAB No. 99, 64 Fed. Reg. 45150, 45152 (Aug. 19, 1999) (emphasis added); *see also Litwin*, 634 F.3d at 719. The Second Circuit has deemed

SAB No. 99 to be persuasive authority. *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Key business relationships can play a significant role in a company's operations or profitability for the purposes of materiality analysis under the SAB No. 99 factors. *See id.* at 204-05.

    A corporation has a duty to disclose a major dispute or uncertainty that exists in an important business relationship where the company publicly touts that specific relationship and the uncertainty may significantly affect the corporation's financial success. *See Globus*, 418 F.2d at 1280-83; *Hutchins*, 2012 WL 1078823, at *6.  Given the investing public's knowledge of the relationship, such uncertainty "significantly alter[s] the 'total mix' of information available." *Time Warner*, 9 F.3d at 267-68 (quoting *TSC Industries*, 426 U.S. at 449).

    This Court cannot conclude that, as a matter of law, Hi-Crush satisfied its disclosure duties with respect to its contract dispute with Baker Hughes once that dispute ripened—which is to say, from and after September 19, 2012.

    In the July 2012 Registration Statement, Hi-Crush had publicly hyped the importance of its relationship with Baker Hughes, explicitly stating that Baker Hughes was one of its "largest customers" and emphasizing the long-term nature of the contractual agreement. *See* Compl. at ¶¶ 52-54.  The Registration Statement projected sales to Baker Hughes to represent 18.2% of Hi-Crush's 2012 revenues. *See id.* at ¶¶ 5, 123, 131.

    On September 19, 2012, however, Baker Hughes notified Hi-Crush via letter that it was terminating the agreement due to Hi-Crush's supposed breach of the confidentiality provision. *See id.* at ¶¶ 7, 63-64.  Though Hi-Crush (correctly, in this Court's view) disputed the validity of the purported contract termination, *see id.* at ¶ 63, the repudiation letter at the very least evidenced a major dispute between Baker Hughes and Hi-Crush.

Despite this repudiation, Hi-Crush continued to tout its contractual relationship with Baker Hughes in an investor presentation that was posted to the Hi-Crush website on September 25, 2012. *See id.* at ¶¶ 6, 116-20. The presentation highlighted Hi-Crush's "Long-Term Contracted Cash Flow Stability" and "Fixed price, fixed volume contracts," specifically mentioning that its most recent contract was "executed May 2012." *See id.* at ¶¶ 117-20; Thau Decl. Ex. 2 at 3, 14. Presumably, this was a reference to the contract renegotiation with Baker Hughes. The presentation stated that the "Weighted average contract life" was "~4.6 years," and that "No more than one contract expires in any one year." *See id.*; Compl. at ¶¶ 119-20. The presentation emphasized the strong reputations of Hi-Crush's customers; it stated that "Blue chip, investment grade market leaders comprise a majority of customer base" and listed Baker Hughes as the first of these four customers. *See id.* Indeed, the presentation portrayed Hi-Crush's contracts with Baker Hughes and its three other major customers as the foundation of its long-term cash flow stability. It gave no hint of any problems with Baker Hughes. These presentation materials were used by Rasmus and Fulton, Hi-Crush GP's Co-CEO and CFO, at the Energy Prospectus Group luncheon on September 25, 2012. *See id.* at ¶¶ 116, 128.

Under these circumstances, Plaintiff has adequately pled that Hi-Crush had a duty to disclose that Baker Hughes had already repudiated the agreement—or at least tried to.

In *Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *1-2, 6, the court held that the plaintiffs sufficiently pled an actionable material omission where a nutritional supplement supplier did not disclose the prospect of losing its largest customer, Wal-Mart. In that case, NBTY's shareholders brought Section 10(b) claims against the company after discovering that Wal-Mart was soliciting competitive bids from other suppliers for the first time in 10 years. NBTY allegedly knew that it would have to lower the prices of its products or lose Wal-Mart's business.

24

NBTY's Form 10-K stated that Wal-Mart accounted for 18% of company sales. The 10-K also noted the lack of any contractual purchase obligations with Wal-Mart and explicitly stated that "loss of Wal-Mart, or any other major customer, would have a material adverse effect on NBTY's operations," but it did not mention the ongoing competitive bidding process that directly threatened sales to Wal-Mart. *See id.* In addition, NBTY's president publicly stated that the company's recently reported gross margins were "sustainable." *See id.* at *1. The court denied the defendants' motion to dismiss.

Here, Plaintiff has an even stronger argument that Hi-Crush had a duty to disclose the omitted fact. Like in *Hutchins*, Hi-Crush publicized that Baker Hughes was a big customer—it projected that Baker Hughes would account for 18.2% of annual sales. Then the investor presentation stressed the fact that Hi-Crush not only had a contract with Baker Hughes, but a *long-term* contract that provided cash flow stability. Thus, investors were not just told that financial results were "sustainable;" they were given concrete facts support Hi-Crush's claim that it could count on future sales to Baker Hughes. The repudiation greatly undercut that claim. Baker Hughes's purported termination was a step closer to losing a customer than the undecided bidding process at issue in *Hutchins*—Baker Hughes had definitively stated that it no longer intended to do business with Hi-Crush. If NBTY had a duty to disclose the competitive bidding process in *Hutchins*, Hi-Crush certainly had a duty to disclose the more momentous contract repudiation at issue here.

The facts of this case are virtually indistinguishable from those in *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1279 (2d Cir. 1969). There, the offering documents of a law research services provider—LRS—"prominently featured an attractive contract" between LRS and its computer services supplier while failing to disclose a serious payment dispute. *See*

*id.* The offering documents referred to LRS's contract with this well-respected supplier "in bold face type" and described the contract in detail. *See id.* at 1282. Some of LRS's investors asserted that they were "specifically impressed" by this contract. *See id.* at 1283. Prior to LRS's public offering, however, the payment dispute had escalated such that the supplier had terminated some services, and LRS had filed suit against the supplier. *See id.* at 1279-81. Upon discovering this fact, shareholders brought claims against LRS under, *inter alia*, Section 10(b), arguing that its offering documents were misleading, and a jury returned a verdict in the plaintiffs' favor. *See id.* at 1279. On appeal, the Second Circuit referred to LRS's failure to disclose the "important dispute" as a "startling omission." *See id.* at 1282-83. It held that there was "adequate evidence from which the jury might conclude that the dispute and lawsuit . . . was a material fact the omission of which from the offering circular caused the circular to be misleading." *See id.* at 1283.

Here, Hi-Crush emphasized its valuable contract with Baker Hughes and traded on Baker Hughes's reputation—it noted the customer's high credit rating and its status as a "Blue chip, investment grade market leader[]." *See* Compl. at ¶ 119. Though the contract dispute with Baker Hughes had not yet escalated to litigation at the time of the investor presentation, Baker Hughes had already asserted a breach of contract and tried to terminate the contract. The dispute appeared to be quite serious, litigation was an imminent possibility, and future sales to Baker Hughes pursuant to the agreement were significantly uncertain.

On these facts, Plaintiff has met its burden of showing that Hi-Crush had a duty to disclose the repudiation because this "secret information render[ed] [ ] public statements materially misleading." *Time Warner*, 9 F.3d at 268. The repudiation was not immaterial as a matter of law.

The 10(b) Defendants counter that Baker Hughes's purported termination was invalid. *See* Hi-Crush Memo at 19. They argue that Hi-Crush did not actually breach the agreement on July 6, 2012 and that, in any event, one or two breaches would not have been enough to give Baker Hughes valid grounds to terminate the contract—four material uncured breaches were required. *See id.*; Hi-Crush Reply at 6. Thus, the 10(b) Defendants contend, the agreement was in full force, the statements in the investor presentation regarding the Baker Hughes agreement were accurate, and the presentation was not misleading. *See* Hi-Crush Memo at 18-19. This argument is flawed.

I complete agree that Hi-Crush did not actually breach its agreement with Baker Hughes, and that Baker Hughes had no valid basis for terminating the agreement. However, even if Hi-Crush believed in good faith that it had not breached the agreement with Baker Hughes and was correct in its belief, a new fact had come to light: *Baker Hughes disagreed.* Baker Hughes had also acted on this belief and sent a letter to Hi-Crush on September 19, 2012 purporting to terminate the agreement. So even if Baker Hughes was wrong, and the contract was technically in full force, Baker Hughes's repudiation produced a new set of uncertainties for Hi-Crush: it drew into question whether Baker Hughes would make purchases going forward and raised the specter of expensive litigation over the parties' relationship. Thus, the repudiation undermined all the positive statements made in the investor presentation about the stable nature of Hi-Crush's relationship with Baker Hughes. The fact that disclosure of the unresolved dispute was accompanied by an immediate 26% decrease in Hi-Crush's stock price on November 13, 2012, *see* Compl. at ¶ 119, is itself evidence that the dispute was a highly material fact. *See SEC v. Penthouse Int'l, Inc.*, 390 F. Supp. 2d 344, 354 (S.D.N.Y. 2005).

Thus, the invalidity of Baker Hughes's purported termination does not make its occurrence immaterial as a matter of law, and Plaintiff has adequately pled that Hi-Crush had a duty to disclose this fact.

### 2. Affirmative Legal Disclose Obligations

Alternatively, the 10(b) Defendants argue that Hi-Crush had no duty to disclose Baker Hughes's repudiation because SEC regulations "expressly reject[]" a duty to disclose an invalid contract termination. *See* Hi-Crush Reply at 5. The premise of the 10(b) Defendants' argument is unsound; compliance with an SEC disclosure obligation does not immunize a company from Section 10(b) liability. *See In re Morgan Stanley*, 592 F.3d at 365.

As discussed above, *see supra* at § II, a corporation has a duty to disclose information, and thus may be held liable under the securities laws for an actionable omission, where there is an "affirmative legal disclosure obligation." *See In re Lehman Bros.*, 799 F. Supp. 2d at 275. Certain SEC regulations impose such disclosure obligations. *See Panther Partners*, 681 F.3d at 120-21.

As the relevant source of a disclosure duty, the 10(b) Defendants point to Item 1.02 of Form 8-K, which governs the circumstances under which a company must file a Form 8-K with the SEC to disclose the "Termination of a Material Definitive Agreement." *See* Hi-Crush Reply at 5-7; 69 Fed. Reg. 15594, 15597 (Mar. 25, 2004). This regulation requires a disclosure whenever "a material definitive agreement . . . is terminated otherwise than by expiration of the agreement on its stated termination date, or as a result of all parties completing their obligations under such agreement . . ." *See id.* at 15620. The Instructions to Item 1.02 also describe situations in which the rule does *not* require an 8-K disclosure:

28

> 1. No disclosure is required *solely* by reason of this Item 1.02 during negotiations or discussions regarding termination of a material definitive agreement unless and until the agreement has been terminated.
>
> 2. No disclosure is required *solely* by reason of this Item 1.02 if the registrant believes in good faith that the material definitive agreement has not been terminated, unless the registrant has received a *notice of termination pursuant to the terms of agreement*.

*See id.* (emphasis added).

The 10(b) Defendants contend that, because Hi-Crush did not breach the agreement at all—let alone four times—Baker Hughes's purported termination was invalid and ineffective; thus, the agreement was binding at the time of the investor presentation. *See* Hi-Crush Reply at 5-6. Because Instruction 1 states that "[n]o disclosure is required . . . until the agreement has been terminated," the 10(b) Defendants argue, Item 1.02 sanctioned Hi-Crush's failure to disclose the repudiation. *See id.* at 5-7. Further, they argue that Plaintiff does not plead that Hi-Crush received a "notice of termination *pursuant to the terms of agreement*" that would require a disclosure under Instruction 2, because Baker Hughes did not comply with the agreement's termination provision; it repudiated the agreement prior to the occurrence of four material uncured breaches. *See id.* at 6. The 10(b) Defendants contend that their compliance with Item 1.02 means that they made no actionable omission under Section 10(b). *See id.* at 5-6.

The 10(b) Defendants are correct that Baker Hughes violated the agreement's termination provision by sending a termination notice prior to the occurrence of four material uncured breaches. Thus, Hi-Crush did not "receive[] a notice of termination *pursuant to the terms of agreement*," and the agreement was not "terminated" within the meaning of Item 1.02. *Id.* Accordingly, this rule did not require Hi-Crush to disclose Baker Hughes's repudiation via a Form 8-K.

But Item 1.02 merely states that no disclosure is required "solely" on the basis of that rule where no valid contract termination occurs. *See id.* It does not establish that there is never a duty to disclose invalid contract terminations under the securities laws. Irrespective of Hi-Crush's compliance with Item 1.02, Section 10(b) still imposed a duty to disclose any facts necessary to avoid misleading investors.

The SEC clearly decoupled the issues of the disclosures required under Item 1.02 and the disclosures required under Section 10(b). First, Item 1.02 does not create an affirmative legal disclosure obligation under Section 10(b); an SEC regulation explicitly created a Section 10(b) safe harbor for the failure to make a disclosure required "solely" under this Item. *See* 17 C.F.R. § 240.13a-11(c). Thus, non-compliance with Item 1.02 is not a basis for Section 10(b) liability.

More important, the final rule implementing Item 1.02 also made it clear that companies are not immunized from Section 10(b) liability for material omissions just because they comply with Item 1.02:

> The safe harbor for [Item 1.02] states that no failure to file a report on Form 8-K that is required *solely* pursuant to the provisions of Form 8-K shall be deemed to be a violation of Section 10(b) and Rule 10b-5 under the Exchange Act. The safe harbor only applies to a failure to file a report on Form 8-K. Thus, *material misstatements or omissions in a Form 8-K will continue to be subject to Section 10(b) and Rule 10b-5 liability.*

69 Fed. Reg. at 15606 (emphasis added). The SEC put corporations on notice that compliance with Item 1.02 cannot be equated with Section 10(b) compliance.

Furthermore, even where the failure to satisfy a particular affirmative disclosure obligation is a basis for Section 10(b) liability, it does not follow that compliance with these obligations connotes compliance with Section 10(b). Compliance with affirmative disclosure obligations does not negate the other basis for a potential duty to disclose under the securities

laws—"to prevent existing disclosures from being misleading." *In re Lehman Bros.*, 799 F. Supp. 2d at 275. These are two independent bases upon which a corporation might have a duty to disclose information. *See In re Morgan Stanley*, 592 F.3d at 365. The fact that a corporation has no affirmative legal obligation to disclose information under applicable SEC regulations "does not mark the end of our inquiry;" the corporation may still have a duty to disclose that information in order to avoid misleading investors. *See id.*

Hence, Hi-Crush's compliance with Item 1.02 did not affect its independent duty to disclose the Baker Hughes repudiation in order to prevent the investor presentation from misleading investors. Even though the repudiation was not a valid contract termination, it was highly material to investors because it nevertheless put 18.2% of Hi-Crush's revenues at risk.

### 3. "Bespeaks Caution" Doctrine and PSLRA Safe Harbor

The 10(b) Defendants also argue that any misstatements or omissions are protected by the "bespeaks caution" doctrine and the corresponding PSLRA Safe Harbor. *See* Hi-Crush Memo at 20. But these defenses do not apply in this case.

Under the "bespeaks caution" doctrine, a "*forward-looking* statement accompanied by sufficient *cautionary language* is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) (emphasis added).

The PSLRA Safe Harbor likewise protects a company from liability under the securities laws where its statements are: (1) "identified as . . . forward-looking," and (2) accompanied by "meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 77z-2(c)(1).

31

However, "misrepresentation of *present* or *historical* facts cannot be cured by cautionary language." *P. Stolz Family P'ship v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) (emphasis added). And "discussing hypothetical risks that might occur in the future does not adequately disclose actual problems that already have materialized." *In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 WL 225288, at *19 (S.D.N.Y. Feb. 1, 2005). These defenses only apply to statements that are forward-looking. *See id.*

Here, the 10(b) Defendants argue that the statements in the investor presentation fall within the PSLRA Safe Harbor and the "bespeaks caution" doctrine because the presentation contained a slide titled "Forward Looking Statements" that "warn[ed] investors that other than factual assertions, the statements therein are forward-looking and caution[ed] against reliance on those statements." Hi-Crush Memo at 20.

But Plaintiff complains of Hi-Crush's concealment of a fact that was "historical" at the time of the investor presentation—Baker Hughes's purported repudiation of one of Hi-Crush's four key contracts, which occurred on September 19, 2012. *See Daum*, 355 F.3d at 96-97. Consequently, neither the Safe Harbor nor the "bespeaks caution" defense is applicable. *See In re Regeneron Pharms.*, 2005 WL 225288, at *19. Any other discussion of hypothetical customer-related risks in the presentation does not "insulate" the omission of the repudiation— which had "already . . . materialized"—from liability. *See id.* at *18.

### 4. Particularity

Plaintiff has also satisfied the particularity requirements of Rule 9(b) and the PSLRA for Section 10(b)'s material misstatement or omission element by "stat[ing] with particularity the circumstances constituting fraud or mistake" and "specif[ying] each statement [or omission]

32

alleged to have been misleading [and] the reason or reasons why the statement is misleading . . ."
15 U.S.C. § 78u-4(b)(1)(B); FED. R. CIV. P. 9(b).

The Complaint sufficiently specifies the misleading statements and omissions: it quotes
the Registration Statement extensively and incorporates relevant slides from the investor
presentation.  The Complaint describes how these documents painted a rosy picture of Hi-
Crush's relationship with Baker Hughes for the investing public.  Plaintiff also details the
pertinent contents of the September 19, 2012 repudiation letter from Baker Hughes and explains
how the letter fundamentally changed the state of the facts such that the subsequent investor
presentation was materially misleading to investors.

The 10(b) Defendants argue that Plaintiff fails to meet the particularity requirement
because it "vaguely attributes fraudulent conduct to 'defendants' collectively, without attributing
specific conduct to a particular defendant."  Hi-Crush Memo at 21.

But to fulfill the particularity requirement, a plaintiff need not enumerate a specific
misleading statement by each individual defendant.  Rather, the "group pleading doctrine"
permits a "presumption that statements in prospectuses, registration statements, annual reports,
press releases, or other group-published information, are the collective work of those individuals
with *direct involvement in the everyday business* of the company."  *In re BISYS Sec. Litig.*, 397
F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (emphasis added); *see also GeoPharma*, 411 F. Supp. 2d
at 451; *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22 n.26 (S.D.N.Y. 2004).  High-level
officers of a company, such as CEOs and executive vice presidents, qualify as such individuals.
*See In re BISYS*, 397 F. Supp. 2d at 441.

Here, the statements (and omissions) in Hi-Crush's official Registration Statement and
investor presentation are properly considered to be statements by Hi-Crush, and they are

obviously attributable to Hi-Crush itself. Under the group pleading doctrine, they are also "group-published information" that is attributable to anyone with "direct involvement" in Hi-Crush's everyday affairs. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 438.

The individual 10(b) Defendants—Rasmus, Whipkey, Fulton, and Alston—are officers of Hi-Crush GP, Hi-Crush's general partner. Rasmus and Whipkey are Co-CEOs, Fulton is the CFO, and Alston is the Chief Operating Officer ("COO"). Under the heading "Management," the Hi-Crush Registration Statement explains that it is "managed and operated by the board of directors and executive officers of [its] general partner." Thau Decl. Ex. 1 at 130. It goes on to list the "Executive Officers and Directors of Our General Partner"—starting with Rasmus, Whipkey, Fulton, and Alston—and describes how each officer's industry experience makes him a valuable member of the management team. *See id.* at 131-32. The "Executive Compensation" table in the Registration Statement also lists Rasmus, Whipkey, and Alston as Hi-Crush's "principal executive officer and [ ] next two most highly-compensated executive officers." *See id.* at 136. Further, each of these four executives signed the Registration Statement. *See id.* at II-4. Thus, the Hi-Crush Registration Statement makes it clear that Rasmus, Whipkey, Fulton, and Alston are part of Hi-Crush's core management team. The Registration Statement and investor presentation are properly considered to be the collective work of these individuals, since they clearly have "direct involvement in the everyday business of the company." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 438.

Furthermore, Rasmus and Fulton actually used the investor presentation materials at a luncheon on September 25, 2012. *See* Compl. at ¶¶ 20, 22, 116. Thus, the statements in the presentation are attributable to them individually.

34

Thus, under the circumstances of this case, Plaintiff has sufficiently pled with particularity that Hi-Crush and the other 10(b) Defendants made actionable material omissions by touting the Baker Hughes contract in the investor presentation while failing to disclose that Baker Hughes had repudiated the contract.

### B. Scienter

In addition to alleging facts showing an actionable omission, to properly plead the Section 10(b) and Rule 10b-5 claims, Plaintiff must state with particularity facts giving rise to a strong inference that each defendant acted with scienter—an intent to deceive or reckless disregard for the truth. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007); *see also* 15 U.S.C. § 78u-4(b)(2)(A); FED. R. CIV. P. 9(b). Although "speculation and conclusory allegations" do not suffice, neither do courts require "great specificity." *See Ganino v. Citizens Utils. Corp.*, 228 F.3d 154, 169 (2d Cir. 2000).

Plaintiffs plead a strong inference of scienter by showing: (1) "motive and opportunity to commit fraud," or (2) strong circumstantial evidence of "conscious misbehavior or recklessness." *JP Morgan Chase Co.*, 553 F.3d at 198. In this case, Plaintiff proceeds under the latter theory. *See* Compl. at ¶ 121, 128, 148; Pl. Opp. at 12-18. Accordingly, "the strength of the circumstantial allegations must be correspondingly greater." *Medis Investor Group v. Medis Technologies, Ltd.*, 586 F. Supp. 2d 136, 141-42 (S.D.N.Y. 2008) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).

Conscious misbehavior or recklessness is defined as conduct that is "*highly unreasonable* and which represents an *extreme departure* from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142 (citation omitted) (emphasis added). To properly allege

35

recklessness, the plaintiff must plead facts showing "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (quotation and citation omitted).

Plaintiffs generally show recklessness by alleging that the defendants "knew facts or had access to information suggesting that their public statements were not accurate" or that they "failed to check information they had a duty to monitor." *Medis*, 586 F. Supp. 2d at 142 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).

"[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. A court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. But the inference that the defendant acted with scienter need "not be irrefutable" or "even the most plausible of competing inferences." *See id.* It must be "cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* (emphasis added).

In determining whether a strong inference exists, the court must consider "whether *all* of the facts alleged, taken collectively, . . . [and] not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original).

### 1. Clear Duty to Disclose

Where a plaintiff alleges a failure to disclose a fact rather than a misrepresentation, that failure can only constitute recklessness if there was a "clear duty to disclose" the fact. *See Kalnit*, 264 F.3d at 144; *see also Stratte-McClure*, 2013 WL 297954, at *8; *Medis*, 586 F. Supp. 2d at 143-44; *GeoPharma*, 411 F. Supp. 2d at 446. Otherwise, the omission cannot be

characterized as "highly unreasonable" and an "extreme departure from the standards of ordinary care." *Kalnit*, 264 F.3d at 142. This rule "ensures that fraudulent intent cannot be imputed to a company every time a public statement lacks detail." *Medis*, 586 F. Supp. 2d at 144.

Some pieces of information are so obviously important to a company's performance, and so clearly in contrast with existing disclosures, that the company cannot reasonably question whether an investor would find the information significant. *See Hutchins*, 2012 WL 1078823, at *6. In such cases, a company has a "clear duty to disclose." *Kalnit*, 264 F.3d at 144. Where a company has already disclosed substantially similar information, however, its duty to disclose a particular fact may be less clear. *See Stratte-McClure*, 2013 WL 297954, at *8-9; *GeoPharma*, 411 F. Supp. 2d at 446.

A corporation's duty to disclose is especially obvious—and, thus, a strong inference of recklessness is adequately pled—where the corporation chooses to selectively reveal positive information on a specific topic while concealing closely-related negative information. *See Hutchins*, 2012 WL 1078823, at *6; *see also In re BP P.L.C. Sec. Litig.*, 922 F. Supp. 2d 600, 627-28 (S.D. Tex. 2013). Such statements are clearly misleading "half-truth[s]." *GeoPharma*, 411 F. Supp. 2d at 446.

In *Hutchins*, discussed *supra* at § III.A.1, the court held that the plaintiff adequately alleged conscious misbehavior or recklessness by defendants who did not disclose that a company's key customer, Wal-Mart, was soliciting competitive bids. *See* 2012 WL 1078823, at *6. The court cited the defendants' "failure to disclose material adverse information concerning the company's largest customer and the potential resulting adverse impact on costs, sales, pricing, operating leverage and profitability, *while making positive statements* about costs, sales, gross margins, and operating leverage and profitability . . ." *Id.* (emphasis added).

37

Similarly, in *Babaev v. Grossman*, 312 F. Supp. 2d 407, 408-10 (E.D.N.Y. 2004), the court held that the plaintiffs had alleged an "obvious" material omission where the defendant catering company had received a contract termination notice from its most important customer but continued to tout the company's expansion plans and supposed status as a "cash cow." The court noted that the catering company was "about to lose a main source of revenue." *See id.* at 410. It went on to state: "The inference of fraudulent intent, in the context of a securities offering, is clear." *See id.*

Finally, the Second Circuit in *Globus*, discussed *supra* at § III.A.1, called the defendant company's failure to disclose that it was involved in a serious payment dispute with its computer services supplier a "startling omission," where the company had prominently hyped its contract with the supplier in the offering documents. *See* 418 F.2d at 1282-83. The court's alarm at the notion that the company would omit the payment dispute from the offering documents implied that the court found the company's duty to disclose to be quite clear.

Here, Plaintiff has sufficiently pled that Hi-Crush had a clear duty to disclose Baker Hughes's contract repudiation, and that the 10(b) Defendants acted recklessly by concealing this information. At the time of the investor presentation, it was obvious that the future of Hi-Crush's relationship with Baker Hughes was in jeopardy—Baker Hughes had flat out rejected the agreement, which meant that Hi-Crush was in danger of losing 18.2% of its revenue. Nevertheless, Hi-Crush's presentation aggressively promoted its supposedly stable, long-term contracts with its four major customers and its agreement with Baker Hughes in particular. That Hi-Crush had the better of the argument with Baker Hughes—that it could have won the lawsuit somewhere down the road—was virtually meaningless in view of the immediate and significant revenue hit that company was going to take. Thus, Hi-Crush "had access to information

38

suggesting that [its] public statements were not accurate." *Medis*, 586 F. Supp. 2d at 142. The investor presentation was unmistakably misleading. Plaintiff's allegations show that Hi-Crush had a "clear duty to disclose" the repudiation, *see Kalnit*, 264 F.3d at 144, and that it was "highly unreasonable" and "an extreme departure from the standards of ordinary care" to hide this fact from investors. *See id.* at 142. Plaintiff has adequately established recklessness.

The 10(b) Defendants argue that Hi-Crush did not have a clear duty to disclose the repudiation, given that the company complied with the requirements of Item 1.02 of Form 8-K, discussed *supra* at § III.A.2. *See* Hi-Crush Reply at 9. They argue that this compliance "militates against" finding that it was reckless not to make a disclosure. *See id.* They point to *In re Centerline Holdings Co. Securities Litigation*, 613 F. Supp. 2d 394, 403-04 (S.D.N.Y. 2009), in support of this contention. *See* Hi-Crush Reply at 9.

In *Centerline*, the defendants made a very similar argument to the one the 10(b) Defendants are making in this case. They argued that they complied with Item 1.01[7] of Form 8-K, *see id.* at 402, which is closely related to Item 1.02 and requires issuance of an 8-K disclosure upon "Entry into a Material Definitive Agreement." *See* 69 Fed. Reg. at 15619. Because they had only entered into a non-binding (as opposed to definitive) agreement for which Item 1.01 did not require a disclosure, the defendants reasoned, they had complied with their disclosure obligations under Item 1.01; therefore, it was not clear that they had a duty to disclose the agreement on another basis—to avoid misleading investors—and it was not reckless to omit this fact. *See Centerline*, 613 F. Supp. 2d at 402.

---

[7] Like Item 1.02 of Form 8-K, Item 1.01 is subject to a Section 10(b) safe harbor—failure to make disclosures that are "solely" required under Item 1.01 does not subject a corporation to liability under Section 10(b) or Rule 10b-5. *See* 17 C.F.R. § 240.13a-11(c). And compliance with Item 1.01—like Item 1.02—does not immunize a corporation from liability under Section 10(b) or Rule 10b-5. *See* 69 Fed. Reg. at 15606.

39

The *Centerline* court did not determine whether, given certain potentially misleading public statements by the defendants, they otherwise would have had a duty to disclose the non-binding agreement; it did note that many of the statements were not misleading. *See id.* at 403 n.66. In any event, the court held that "the existence of SEC regulations relating to the disclosure of these transactions and defendants' compliance with them suggests that Lead Plaintiff has failed to show defendants acted recklessly in omitting such information;" the failure to disclose the non-binding agreement was not "highly unreasonable." *See id.* at 403-04.

If the *Centerline* court actually held that, where a corporation complies with an applicable SEC disclosure regulation, it cannot have a "clear" duty to disclose information to avoid misleading investors such that the failure to do so constitutes recklessness, then I disagree with my learned colleague (whose decision does not bind me in any event).

As discussed above, *see supra* at § III.A.2, the Second Circuit has made it clear that there are two *independent* bases upon which the securities laws might impose a duty to disclose: (1) an affirmative legal disclosure obligation, or (2) to avoid misleading investors. *See In re Morgan Stanley*, 592 F.3d at 360-66; *Time Warner*, 9 F.3d at 267-68. Here, the imminent rupture in a relationship that was supposed to generate 18.2% of Hi-Crush's revenue stream made it imperative that investors be told about Baker Hughes's threat—even if the disclosure were tempered (as it could and should have been) by Hi-Crush's observation that Baker Hughes was dead wrong in every respect.

In *In re Morgan Stanley Information Fund Securities Litigation*, the court demonstrated the proper mode of analysis. *See* 592 F.3d at 360-66. It first analyzed whether SEC rules required disclosure of a particular fact in the defendants' prospectus. *See id.* at 361-65. Once the court determined that there was no affirmative disclosure obligation under applicable SEC rules,

40

it stated: "Our conclusion that [the SEC form] did not directly require defendants to disclose the allegedly omitted information *does not mark the end of our inquiry*." *See id.* at 365 (emphasis added). It then proceeded to analyze whether the defendants had a duty to disclose the fact at issue to avoid misleading investors. *See id.* at 365-66.

Given that the duty to disclose to avoid misleading investors is plainly independent of a company's affirmative disclosure obligations, it is not reasonable for a corporation to believe that its compliance with SEC regulations means that it has met all its disclosure duties under Section 10(b). There can still be a "clear duty to disclose" crucial information to avoid misleading investors. *See Kalnit*, 264 F.3d at 144. Thus, I decline the 10(b) Defendants' invitation to follow *Centerline*.

Moreover, it is especially obvious that compliance with Item 1.02 of Form 8-K does not connote compliance with one's disclosure duties under Section 10(b). As discussed above, *see supra* at § III.A.2, the SEC final rule implementing Item 1.02 explains that corporations can be held liable under Section 10(b) irrespective of their compliance with Item 1.02. *See* 69 Fed. Reg. at 15606. Hi-Crush should have known that the securities laws imposed an independent duty to disclose to avoid misleading investors.

To summarize, Plaintiff's allegations show that Hi-Crush had a clear duty to disclose Baker Hughes's contract repudiation to avoiding misleading investors, and the 10(b) Defendants cannot reasonably claim that Item 1.02 made this duty any less obvious. Thus, Plaintiff has adequately alleged recklessness.

### 2. Strong Inference of Scienter

Plaintiff has also pled a sufficiently strong inference of scienter when taking into account "plausible opposing inferences." *Tellabs*, 551 U.S. at 323.

41

The 10(b) Defendants argue that the "more compelling inference" in this case is that they did not disclose the Baker Hughes repudiation for an "innocent" reason—they "believed" that the purported termination was invalid, that the contract was still binding, and that they were not required to disclose this fact. *See* Hi-Crush Memo at 24-25.

It is possible that Hi-Crush and the other 10(b) Defendants did foolishly believe that a major customer's repudiation of its long-term contract was a minor detail. They could have reasoned that, because the termination was invalid, the dispute was immaterial and did not need to be mentioned alongside all the positive statements about the Baker Hughes agreement in the investor presentation.

But the Plaintiff's theory of recklessness "need not be irrefutable." *Tellabs*, 551 U.S. at 324. The facts alleged by Plaintiff just as easily support an inference that Hi-Crush recklessly (or even intentionally) concealed the repudiation with knowledge that this omission posed a high danger of misleading investors. *See Kalnit*, 264 F.3d at 142. Given that Baker Hughes had unexpectedly repudiated the parties' agreement a few days prior, the investor presentation's optimistic references to this agreement were conspicuously incomplete. One can logically infer that Hi-Crush consciously chose to withhold information about the repudiation from the public in the hopes that the dispute would be quickly resolved and that investors would be none the wiser.

An inference of recklessness is "cogent and at least as compelling" as the "nonculpable explanation[]" for the failure to disclose Baker Hughes's repudiation. *See Tellabs*, 551 U.S. at 324.

42

### 3.  Scienter of Each 10(b) Defendant

Finally, Plaintiff has satisfied the heightened pleading requirements of Rule 9(b) and the PSLRA by pleading securities fraud with particularity—it has alleged a strong inference of scienter for each of the 10(b) Defendants.

To allege the scienter of a corporate defendant, a plaintiff need not name a specific individual who acted with the requisite scienter—she need only plead facts that "create a strong inference that *someone whose intent could be imputed* to the corporation" did so. *Dynex Capital Inc.*, 531 F.3d at 195 (emphasis added). The scienter of an employee acting within the scope of employment can be imputed the employer. *See Vining v. Oppenheimer Holdings Inc.*, No. 08 Civ. 4435 (LAP), 2010 WL 3825722, at *12 (S.D.N.Y. Sept. 29, 2010).

For individual defendants, a plaintiff must allege facts showing that each individual had the requisite state of mind—in this case, recklessness. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 438.

To fulfill the scienter pleading requirement, a plaintiff may rely on the "core operations doctrine," which permits an inference that a company and its senior executives have knowledge of information concerning the "core operations" of a business. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *Medis*, 586 F. Supp. 2d at 145; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004). Core operations include matters "critical to the long term viability" of the company and events affecting a "significant source of income." *Cosmas*, 886 F.2d at 13; *Medis*, 586 F. Supp. 2d at146.

Here, the Plaintiff argues that the 10(b) Defendants acted recklessly by publicly touting the company's relationship with Baker Hughes in Hi-Crush's investor presentation with knowledge that this key customer had repudiated its contract. Thus, Plaintiff must show that knowledge of the repudiation is attributable to all the 10(b) Defendants.

43

Plaintiff has met this burden. First, the 10(b) Defendants include members of Hi-Crush's senior management team—Rasmus, Whipkey, Fulton, and Alston. These four individuals were intimately involved in the day-to-day operations of Hi-Crush, and they can be presumed to have knowledge of the company's core operations. *See Atlas Air*, 324 F. Supp. 2d at 489. Moreover, the statements in the Registration Statement and the investor presentation are attributable to each of the 10(b) Defendants, *see supra* at § III.A.4, so they were clearly aware of the importance of the Baker Hughes agreement.

Second, the status of the agreement with Baker Hughes was unquestionably within the "core operations" of Hi-Crush. This agreement was a "significant source of income"—18% of projected 2012 revenues—that was "critical to the long term viability" of Hi-Crush. *See Cosmas*, 886 F.2d at 13; *Medis*, 586 F. Supp. 2d at146. Senior managers of Hi-Crush would naturally be apprised of important developments in the Baker Hughes agreement. Thus, it can be inferred that the four individual 10(b) Defendants had knowledge of the repudiation letter at the time that the investor presentation became public. Such knowledge permits a strong inference that they were reckless not to disclose the repudiation under the circumstances; Plaintiff sufficiently alleges scienter for each of the four individual 10(b) Defendants.

Plaintiff also adequately pleads scienter for Hi-Crush itself, since Rasmus, Whipkey, Fulton, and Alston acted within the scope of their positions as Hi-Crush senior managers when they acted recklessly; thus, their scienter can be imputed to Hi-Crush. *See Dynex Capital Inc.*, 531 F.3d at 195; *Vining*, 2010 WL 3825722, at *12. Further, the Complaint directly alleges that at least someone at Hi-Crush received the repudiation letter before Hi-Crush published the investor presentation. This assertion is sufficient to show that Hi-Crush acted recklessly.

The motion to dismiss Count IV is denied.

44

### C.    Control-Person Liability Under Section 20(a)

Finally, Plaintiff adequately pleads its Section 20(a) claims.

To establish a prima facie case of liability under Section 20(a), a plaintiff must show:
(1) a primary violation by a controlled person; (2) control of the primary violator by the
defendant; and (3) "that the controlling person was in some meaningful sense a culpable
participant" in the primary violation. *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)
(quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)); *see also Camofi
Master LDC v. Riptide Worldwide, Inc.*, No. 10 Civ. 4020 (CM), 2011 WL 1197659, at *10
(S.D.N.Y. Mar. 25, 2011).

As explained above, *see supra* at §§ III.A and III.B, Plaintiff has adequately alleged
primary violations by Hi-Crush, Rasmus, Whipkey, Fulton, and Alston. The 20(a) Defendants—
Hi-Crush GP, Rasmus, Whipkey, Fulton, and Alston—argue that Plaintiff has failed to plead
both the control and culpable participation elements of its Section 20(a) claims.

"To plead control over a primary violator, a plaintiff must allege that the defendant
possessed the power to direct or cause the direction of the management and policies of a person,
whether through the ownership of voting securities, by contract, or otherwise." *In re BISYS*, 397
F. Supp. 2d at 451 (internal citation omitted).

"In order to plead that a defendant culpably participated in an alleged fraud, plaintiffs
must adequately allege that the defendant acted at least with recklessness, in the sense required
by Section 10(b) of the Exchange Act and Rule 10b–5." *In re American International Group,
Inc., 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 536 (S.D.N.Y. 2010).

As explained above, *see supra* at § III.B, Plaintiff has adequately alleged that Rasmus,
Whipkey, Fulton, and Alston acted recklessly by failing to disclose the Baker Hughes

45

repudiation. Thus, it has also pled their culpable participation in the fraud within the meaning of Section 20(a). It has further shown that these four individuals controlled Hi-Crush, given that they are members of the core management team. *See supra* at § III.A.4.

With respect to Hi-Crush GP, the Registration Statement makes it clear that Hi-Crush GP completely controls Hi-Crush. *See supra* at § III.A.4. Because Rasmus, Whipkey, Fulton, and Alston acted within the scope of their employment as officers of Hi-Crush GP when they managed the daily affairs of Hi-Crush, their culpable participation in the fraud can be attributed to Hi-Crush GP.

Thus, Plaintiff has sufficiently pled primary violations by Hi-Crush and that Hi-Crush GP, Rasmus, Whipkey, Fulton, and Alston both controlled Hi-Crush and culpably participated in the primary violations. The motion to dismiss Count V is denied.

## CONCLUSION

For the foregoing reasons, the Defendants' motions to dismiss are granted with respect to Counts I, II, and III and denied with respect to Counts IV and V. The Clerk of the Court is directed to close out the motions at Docket Nos. 63 and 66 and to remove same from the Court's list of pending motions.

Dated: December 2, 2013

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

46